**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANGEL DIAZ, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
|       v. | ) |
| | ) CAUSE NO.: |
| CITY OF CHICAGO, | ) JURY TRIAL DEMANDED |
| DET. REYNALDO GUEVARA, former | ) |
| Chicago Police Department Detective, | ) |
| GERI LYNN YANOW, as Special | ) |
| Representative of the Estate of | ) |
| DET. ERNEST HALVORSEN, deceased former | ) |
| Chicago Police Department Detective, and | ) |
| other presently-unknown officers/agents of | ) |
| the CHICAGO POLICE DEPARTMENT, | ) |
| | ) |
|       Defendants. | ) |

## <u>COMPLAINT</u>

Comes now, Plaintiff, ANGEL DIAZ, by counsel, **Midwest Injury Lawyers, LLC**, **Erickson Law, LLC**, and **Sam Adam, Jr. Law Group**, and for his Complaint against Defendants, CITY OF CHICAGO (hereinafter, "The City"), DET. REYNALDO GUEVARA (hereinafter, "Guevara"), former Chicago Police Department Detective, GERI LYNN YANOW, as Special Representative of the Estate of DET. ERNEST HALVORSEN (hereinafter, "Halvorsen"), former Chicago Police Department Detective, (hereinafter and collectively, "Defendants"), respectfully states as follows:

## I.     INTRODUCTION

1.     This is a civil rights action brought pursuant to 42 U.S.C. §1983, 42 U.S.C. §1988 and Illinois state law to address deprivations under the color of law of the Plaintiff, Angel Diaz's (hereinafter, "Plaintiff") rights secured by the United States Constitution.

2.     On January 17, 1996, Plaintiff, then age 22, was wrongfully convicted of one count of first-degree murder and two counts of aggravated discharge of a firearm relating to the January 27, 1995 murder of Yolanda Leal (hereinafter, "Yolanda").

3.     Plaintiff had nothing to do with the murder, there was no physical evidence linking Plaintiff to the murder. Additionally, Plaintiff had no motive to commit the crime.

4.     Instead, Plaintiff's arrest, prosecution and conviction were based entirely on evidence knowingly manufactured by the Defendants, including false identification, fabricated witness statements and perjured testimony. This was done in conjunction with concealment of exculpatory evidence that could have been used to establish Plaintiff's actual innocence.

5.     The framing of Plaintiff for a crime he did not commit was the work of notorious and disgraced Chicago Police Department (hereinafter, "CPD") Detectives Guevara and Holverson.

6.     At his trial, the State relied on a singular and crucial witness, Luis Figueroa (hereinafter, "Figueroa"). Guevara and Halvorsen forced Figueroa to make false identifications of Plaintiff as the perpetrator of Yolanda's murder. Guevara and Halvorsen also coerced and pressured Figueroa to make false statements to a Cook County Grand Jury implicating Plaintiff in Yolanda's murder.

7.     Figueroa ultimately repudiated and recanted his grand jury testimony at Plaintiff's bench trial. During the trial, Figueroa disclosed that Guevara and Halvorsen forced him to make identifications and statements to frame Angel for Yolanda's murder. Notwithstanding, the Court gave weight to Figueroa's grand jury testimony and wrongfully convicted Plaintiff.

8.     Plaintiff was ultimately sentenced to a term of thirty (30) years in the Illinois Department of Corrections on the first-degree murder conviction and seven (7) years on the two convictions for aggravated discharge of a firearm. The trial court ordered that all the sentences be served consecutively for a total of forty-four (44) years.[1]

9.     Following Plaintiff's convictions and sentencing, he continued to maintain his innocence and pursue post-conviction relief. During this process, Plaintiff obtained three affidavits from Figueroa, which again indicated that Guevara told Figueroa that he "wanted to get Diaz," forced Figueroa to identify Plaintiff as the shooter, and coached Figueroa on how to testify before the grand jury to fit the false narrative he and Halvorsen concocted.

10.     In the years since Plaintiff's wrongful convictions and incarceration, approximately thirty-nine (39) homicide convictions investigated by Guevara have been overturned due to his and other CPD officers' intentional framing of innocent individuals in those cases.

---

[1] Note: Plaintiff sought collateral relief in a post-conviction proceeding on December 10, 2001, properly arguing that the trial court erred in sentencing him to serve consecutive prison terms and in merging his two firearm convictions. The trial court granted the post-conviction relief and ordered that the sentences run concurrently and vacated one of the firearm convictions.

11. The Illinois Appellate Court has called Guevara "a malignant blight on the Chicago Police Department and judicial system."

12. Cook County courts have found that "Detective Guevara engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Guevara told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

13. On August 9, 2022, the Cook County State's Attorney's Office entered a mass dismissal of seven (7) Guevara homicide convictions, and State's Attorney Kim Foxx stated during the corresponding press conference, "we cannot stand by these convictions based on serious allegations of misconduct and findings of credibility against Detective (Reynaldo) Guevara."

14. Guevara has invoked his Fifth Amendment rights on numerous occasions when questioned about past homicide investigations, including on questions relating to Plaintiff's case. During an August 20, 2019 deposition, Guevara was, *inter alia*, asked, "Sir, did you frame Angel Diaz for the 1995 murder of a woman named Yolanda Leal?" Guevara failed to deny the allegation and invoked his Fifth Amendment right not to incriminate himself.

15. On April 25, 2023, Plaintiff's Petition for Post-Conviction Relief was granted, his convictions were vacated, the charges were dismissed, and he was finally exonerated of these crimes.

16.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct.

## II.     JURISDICTION AND VENUE

17.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the United States Constitution.

18.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.

19.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in the judicial district. The events giving rise to this Complaint occurred in this judicial district and in the Eastern Division of this Court.

## III.     PARTIES

20.     Plaintiff is a 49-year-old Latino male who spent 15 years wrongfully incarcerated for a murder he did not commit.

21.     At all times relevant herein, Guevara, Halvorsen, and other unknown law enforcement officers were CPD Officers (hereinafter and collectively, "Police Officer Defendants"), acting under the color of law and within their course and scope of employment with The City.

22.     Geri Lynn Yanow, the special representative for the Estate of Det. Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative

for the Estate of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant, Ernest Halvorsen.[2]

23.     At all times relevant to this Complaint, Guevara and Halvorsen were detectives in CPD's Area Five District and partners.

24.     Defendant, City of Chicago (hereinafter, "The City") is a municipality incorporated under the laws of the State of Illinois, and it operates the CPD. The City employed Defendants as well as yet unknown CPD officers, detectives or command staff.

## IV.     FACTUAL BACKGROUND

### A.  *January 27, 1995 murder of Yolanda Leal*

25.     On January 27, 1995, Yolanda was shot at 1840 N. California Avenue in Chicago, Illinois.

26.     At the time of the shooting, Yolanda was seated in the driver's seat of her purple 1980 Chevrolet Citation when another vehicle pulled alongside her car and opened fire. Yolanda was struck in her left temple by a medium caliber bullet.

27.     Yolanda's boyfriend, Figueroa, was seated in the front passenger's seat during the shooting. Another friend, Aurelia Mojica (hereinafter, "Mojica") was seated in the back seat of the vehicle.

---

[2] Note: The City of Chicago has previously stipulated to Geri Yanow serving as the special administrator for the estates of deceased CPD officers for purposes of defending against actions. *See, e.g., DeLeon-Reyes v. Guevara, et al.*, Case No.: 1:18-cv-02312, Doc. No. 393 (N.D. Ill. Jan. 13, 2021); *Allen v. City of Chicago, et al.*, 1:22-cv-03044, Doc. No. 24 (N.D. Ill. Sept. 9, 2022). Plaintiff reserves the right to file a stipulation for appointment of Ms. Yanow, or other designee the City names, to serve as special representative for the Estate of Halvorsen in this action at a later date.

28.     One witness said that she heard three apparent shots and immediately looked out her front window. When she looked out of her window, the witness said that she saw the car containing Yolanda and Figueroa. She stated that she saw Figueroa exit Yolanda's car and outstretch his arms towards an older model blue car and pickup truck that had just driven past. She then stated that Figueroa went back to Yolanda's vehicle and began to scream.

29.     The witness did not see any muzzle flashes or other indications as to where the shots were coming from. She stated that at the time the shots were fired, there was no car next to the victim's car and that the two cars that she saw pass the victim's car were near the corner at the stop sign near Bloomingdale Avenue. She described the two passing vehicles as an "older model blue car" and a "pick-up truck." This witness did not see any of the perpetrators nor was she able to identify any shooter.

30.     Another witness, Tany Ayoro, who was dropped off at her apartment approximately 10 minutes before the shooting, stated that she heard 3-4 shots, ran to her window and heard Figueroa yelling that Yolanda had been shot. She did not witness the shooting nor was she able to identify any shooter.

31.     The first responding CPD Officers arrived at the scene at 10:40 p.m., a mere sixty (60) seconds after the shooting. One of those officers was CPD Officer P. Gill (Star No. 15349). Officer Gill talked to both Figueroa and Mojica. While clearly still in an excited state, both Figueroa and Mojica told the responding officers **that they did not observe the offender(s)**.

32.     No responding officer put a description of the offender over the radio.

33.    No description of the fleeing car was reported over the radio.

34.    No responding officer made a radio call informing dispatch that the fleeing suspect was Plaintiff.

35.    The extant weather conditions were not conducive to individual or vehicle identification as it was thirty-two (32) degrees, snowing and dark.

**B.  *Guevara and Halvorsen take over the investigation and framing of Plaintiff begins***

36.    Ultimately, Guevara and Halvorsen were assigned to Yolanda's murder investigation.

37.    Guevara and Halvorsen were familiar with Plaintiff as his picture was on file in the CPD Area Five Gang File.

38.    At some point after the shooting, Guevara went to the home of the Leal Family. There, he spoke to Yolanda Leal's father, Willie Leal (hereinafter, "Willie"). Without any corroborating evidence, Guevara told a grieving Willie that Plaintiff killed Yolanda.

39.    Guevara and Halvorsen knew that Figueroa and Diaz knew one another and that their familiarity with each other was long-standing. Guevara was aware that they attended elementary and high school together. Guevara and Halvorsen also had knowledge that Figueroa and Plaintiff were allegedly members of rival gangs engaged in a war, Spanish Cobras (hereinafter, "SC") and Latin Disciples (hereinafter, "LD"), respectively.

40. Guevara's sole purpose of visiting the Leal home was to plant Angel's name in Willie's head. Guevara did this with the expectation that Willie would pass the information to Figueroa who would, in turn, falsely implicate Plaintiff in Yolanda's murder. To further this objective, and after falsely communicating that Plaintiff was the shooter, Guevara began pushing Willie to convince Figueroa to meet with them to implicate Plaintiff in the murder.

41. On January 29, 1995, Guevara's nefarious plan worked, and Willie told Figueroa that Plaintiff shot Yolanda.

42. In an attempt to cover-up Guevara's clear manipulation of Figueroa through Willie, Guevara and Holverson falsified investigative reports to indicate that Figueroa initially communicated to Willie that Plaintiff was the shooter, not the other way around, *i.e.* that Willie initially told Figueroa that Plaintiff was the shooter. Guevara and Holverson further falsified dates and times within their reports to support the fabricated timeline regarding the flow of information between Willie and Figueroa pertaining to the identity of the shooter..

## C. *Guevara and Halvorsen manipulate the February 5, 1995 Photo Array and falsify its results*

43. On February 5, 1995, and after Guevara's manipulation of Willie, Figueroa and Willie arrived at the Area Five Headquarters to meet with Guevara and Halvorsen for a photo array.

44. Guevara laid out six photographs, one of which depicted Plaintiff, and asked Figueroa, "whether or not [he] recognized anyone from those photos."

45. Figueroa never identified Plaintiff as the shooter from the photo array. In reality, Guevara simply asked Figueroa whether he knew any of the individuals in the photo array. Obviously, Figueroa knew Plaintiff from the neighborhood and school, and said "I know him" in response to Guevera's question.

46. Guevara never asked Figueroa whether any of the individuals in the photo array were the perpetrators of Yolanda's murder. Instead, Guevara intentionally conflated Figueroa's response of "I know him" with a positive identification of the shooter.

47. Guevara's photo array was further coercive and manipulated as he allowed Yolanda's grief-stricken father to attend the photo array session, which was designed to apply undue pressure on Figueroa to make the positive identification of Plaintiff as the shooter.

48. Despite the fact that Figueroa did not identify Plaintiff as the shooter in the February 5, 1995 photo array, Guevara and Halvorsen arrested Plaintiff later that day.

49. In order to articulate probable cause for Angel's arrest, Guevara and Halvorsen intentionally falsified their arrest report, stating under oath, "[Plaintiff] was identified by an eye-witness in a photo array as the offender who on 27 Jan. 1995 at 1840 N. California, shot Yolanda Leal in the head with a hand gun."

**D. Guevara and Halvorsen fabricate February 6, 1995 line-up**

50. After the failed identification at the photo array, Guevara again brought Figueroa to Area Five for a live line-up. Once again, Guevara brought Willie in to continue to pressure Figueroa to make a positive identification of Angel.

51.     Similar to his conduct with the photo array, Guevara engaged in his pattern and practice of intimidating, threatening and influencing witnesses when he forced/manipulated Figueroa to identify Plaintiff from the line-up as Yolanda's shooter. Figueroa testified in Angel's trial:

Q: Do you recall identifying anyone in that lineup?

A: Yeah.

Q: I'll give you this pen and I'll ask you to place an X over the head of the person you identified in that lineup back in February of 1995?

A: (Document marked).

Q: You've placed an X over the person positioned third from the left in that lineup, is that correct?

A: Yes.

Q: Do you see the person you identified in the lineup here in Court today?

A: He's wearing a county uniform.

Q: Now, while you were at Grand and Central on that date did you pick him out as the person that shot Yolanda Leal?

A: **I picked him out because the police told me to pick him out.**

52.     Consistent with his pattern and practice, both before and after the line-up here, Guevara simply lied about the line-up identification of Angel. In reality, Figueroa was unable to identify Plaintiff as the perpetrator during the lineup or at any other point in time.

53.     Ultimately, Guevera and Halvorsen, through the use of threats of prosecution and coercion, forced Figueroa to falsely select Plaintiff from the lineup. This

was a known pattern and practice of Guevara. *See, e.g., People v. Arcos,* 282 Ill. App.3d 870 (1st Dist. 1996) (overturing conviction on direct appeal when Guevara threatened to pin a murder on a witness if he did not positively identify the individual Guevara sought to frame for the murder).

54. Guevara and Halvorsen falsified the lineup report to implicate Angel. In doing so, they concealed the exculpatory evidence that Figueroa was unable to make a positive identification of Plaintiff or any other individual in the lineup. This was all done in furtherance of framing Plaintiff and securing a wrongful conviction.

**E. Guevara manufactures motive to support the fabricated identification for the grand jury proceedings against Plaintiff**

55. Following the line-up, Guevara continued to pray on Figueroa's fragile emotional state following the loss of his girlfriend to gun violence. Figueroa's grief, combined with Guevara's intense pressure tactics on him, caused Figueroa to falsely implicate Plaintiff in a fabricated statement.

56. On February 6, 1995, Guevara drafted the false statement attributed to Figueroa outside of the presence of the felony review assistant state's attorney.

57. Guevara completely manufactured the information in the statement to fit his and Halvorsen's false narrative that Plaintiff murdered Yolanda as part of an ongoing gang war.

58. Despite Figueroa's insistence that he could not identify Yolanda's shooter, Guevara compelled Figueroa to sign the false statement implicating Plaintiff as the shooter.

59.     As part of a pattern and practice of Guevara, Figueroa was fed false facts by Guevara before the felony review assistant state's attorney came into the interview room to obtain the written statement. This false narrative contained in the written statement was rehearsed in the absence of the prosecutor.

60.     Consistent with his pattern and practice, Guevera forced witnesses to cite gang wars as the motive for the murder. Specifically, Guevara compelled Figueroa to falsely implicate Plaintiff in an earlier shooting at Mozart and Cortland on January 27, 1995. Guevara and Halvorsen forced Figueroa to say Plaintiff shot at members of Figueroa's gang while "banging" and throwing up rival signs from a passing vehicle earlier in the day and prior to Yolanda's murder.

61.     There was no connection between the alleged shooting at Mozart and Cortland and the death of Yolanda Leal until Defendants' involvement. Providing motive, and particularly weaving a fatal shooting into a narrative about one or more same-day retaliatory shootings was an established pattern and practice of Police Officer Defendants.

62.     There was no meaningful investigation or physical evidence recovered from the alleged shooting at Mozart and Cortland, nor was any there any criminal charges filed against Plaintiff relating to this shooting. In reality, no such shooting ever occurred, and it was merely a fabrication by Guevara and Halvorsen to provide motive evidence to support their wrongful murder charges against Plaintiff.

63.     Ultimately, Plaintiff's case reached a Cook County Grand Jury.

64.    At the grand jury stage, Guevara and Halvorsen threatened, coached and pressured Figueroa to testify consistent with the false narrative they created, implicating Plaintiff as Yolanda's shooter and that the murder was motivated by an ongoing gang war between SC and LD.

65.    The grand jury found that there was probable cause to charge Plaintiff with Yolanda's murder based on the false identifications of Plaintiff and perjured testimony of Figueroa suborned by Guevara and Halvorsen.

### F.    The Trial

66.    In January 1996, Angel's bench trial related to Yolanda's murder commenced in the Circuit Court of Cook County-Criminal Division.

67.    The State's case was solely based on Figueroa's false identification of Plaintiff as Yolanda's shooter and fabricated statements. There was no physical evidence or additional witnesses linking Plaintiff to Yolanda's murder.

68.    By the time the case reached the bench trial, Figueroa recanted his grand jury testimony.

69.    At trial, Figueroa specifically testified that he did not know who shot Yolanda, which was consistent with what he had initially told responding officers at the scene seconds after the shooting.

70.    Figueroa further testified that Guevara and Halvorsen forced him to select Plaintiff from the photo array and lineup despite his insistence that he did know who shot Yolanda.

71.     Once Figueroa recanted his grand jury testimony, the State impeached Figueroa with his purported statement implicating Plaintiff in the murder, which was completely fabricated and authored by Guevara.

72.     The State further argued motive based on Figueroa's false and coerced statement inferring that Yolanda was caught in the middle of a gang war between his and Plaintiff's rival gangs.

73.     On January 17, 1996, the court found Plaintiff guilty of one count of First-Degree Murder and two counts of Aggravated Discharge of a Firearm. The court exclusively relied on Figuroa's false and coerced identifications, statements and grand jury testimony to convict Plaintiff.

74.     Plaintiff was sentenced to a term of thirty (30) years IDOC on the First-Degree Murder and seven years on the two Aggravated Discharge of a Firearm counts to run consecutive for a total of forty-four (44) years.

### G. *The City of Chicago's policies and practices facilitating Police Officer Defendants' conduct*

75.     The egregious misconduct of the Police Officer Defendants in this case was not an isolated occurrence. It was undertaken pursuant to, and proximately caused by, the *de facto* policies and practices of the City, acting through the CPD and its officers, which were in place at all relevant times pertaining to this case.

76.     The City of Chicago routinely failed to investigate cases in which CPD detectives recommended charging an innocent person with a serious crime, and no CPD officer has ever been disciplined as a result of his or her misconduct in any of those cases.

77.     Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for CPD officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

78.     For instance, multiple witnesses have come forward with evidence that Guevara was part of a criminal drug enterprise. Guevara used his status as a detective to advance the criminal drug enterprise he participated in, and to pressure drug dealers that did not do his bidding. Guevara's assistance included working with other CPD officers to pin murders on innocent men.

79.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed CPD officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

80.     The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, who personally filed two Internal Affairs complaints against CPD

officers for tampering in homicide investigations that resulted in no discipline whatsoever; and Raymond Risley, an Assistant Deputy Superintendent and Head of Internal Affairs, who not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into CPD Officers that was at the heart of the Klipfel litigation.

81. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the CPD, which has been acknowledged by leaders of the CPD and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

82. As a result of the CPD's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the CPD. As a result of these policies and practices of the City of Chicago, members of the CPD act with impunity when they violate the constitutional and civil rights of citizens.

83. This belief extends to the Defendants in this case. By way of example, Guevara and Halvorsen have long histories of engaging in the kind of investigative

misconduct that occurred in this case. There are dozens of known cases in which Guevara, Halvorsen and other CPD officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that The City and CPD would ever discipline them for doing so.

84. The City and CPD also failed, in the years prior to the Plaintiff's wrongful conviction, to provide adequate training to CPD detectives and other officers in many areas, including the following:

    a. The conduct of live lineup, photographic, and other identification procedures.

    b. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

    c. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

    d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

    e. The risks of engaging in tunnel vision during investigation.

    f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

85. The need for police officers to be trained in these areas was and remains obvious.

86. The City's failure to train CPD officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his resultant damages.

87. The City's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of The City's practices and de facto policies, as alleged above.

88. The City and final policymaking officials within the CPD failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

89. The policies and practices described in the foregoing paragraphs were also approved by The City's policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

90. These cases include many in which CPD police officers used the same tactics that the Defendants employed against Plaintiff in this case, including: (1) fabricating witness statements; (2) concealing exculpatory evidence; (3) manipulating witnesses in order to influence their testimony; (4) intentionally coaching and compelling witnesses to offer false and fabricated testimony during grand jury proceedings; and (5) using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

91. The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of A Case:

Interview with Assistant State's Attorney Terence Johnson. The Report's findings include, *inter alia*, that CPD detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

92. At all relevant times, the City also had in place *de facto* policies and practices by which CPD officers, including the individual Defendants in this case, were led to believe they could act with impunity, which served to facilitate and further their misconduct. These policies and practices include: failing to identify and track officers who commit serious acts of misconduct; failing to investigate cases in which CPD officers are implicated in obtaining coerced and false confessions, as well as unfounded charges and wrongful convictions; fabricating identifications and/or withholding exculpatory evidence regarding identifications; failing to meaningfully discipline officers accused of such unlawful conduct; and facilitating a code of silence within the CPD. Pursuant to the City's code of silence, CPD officers were trained and required to lie or remain silent about misconduct committed on the job by their fellow officers.

93. At all relevant times hereto, members of the CPD, including Police Officer Defendants in this case, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in the files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and

practice, these clandestine files were withheld from the Cook County State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being maintained as part of the official file.

94.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City, including the Defendants in this case, concealed exculpatory evidence from Plaintiff.

95.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Fields v. City of Chicago*, 10-CV-1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87-CV-2536, 88-CV-1127 (N.D. Ill.).

96.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of Yolanda's murder and the related investigation.

97.     All the policies and practices described in the foregoing paragraphs were knowingly approved by The City's policymakers, who were deliberately indifferent to the fact that its officers and investigators systematically violated the rights of the people they were sworn to protect.

### H. Guevara and Halvorsen's pattern and practice of framing innocent individuals and violating constitutional rights of the accused

98.     As a result of the policies and practices of the CPD, described above, Guevara and Halvorsen framed dozens of other innocent men and women over the span

of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Guevara and Halvorsen.

99.     As of the filing of this Complaint, at least thirty-nine (39) men and women have had their convictions thrown out because of Guevara and/or Halvorsen's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, and John Martinez. These men and women served hundreds of years in prison for crimes they did not commit.

100.    Guevara and Halvorsen have long histories of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Guevara and Halvorsen engaged in serious investigative misconduct.

101.     Given this extensive history of misconduct and The City's failure to meaningfully supervise or discipline Guevara, Halvorsen and others, it is apparent that Guevara and Halvorsen engaged in such misconduct because they had every reason to believe that The City and its Police Department condoned their behavior.

102.     Repeatedly, Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. The allegations Guevara has refused to respond to include allegations that he has manipulated dozens of witnesses to provide false identifications, he has fabricated false evidence, he has suppressed exculpatory evidence, including documentary evidence, he has tortured and abused suspects and witnesses and has coerced false statements from them, as well as every single instance of misconduct detailed below.

103.     A few examples of Guevara and Halvorsen's misconduct include:

a.    Bill Dorsch is a former CPD detective. While serving with the CPD, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Guevara pointed to the suspect's photo and told the juvenile "That's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside of Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.  Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of CPD officer Joseph Miedzianowski and his associates, including Guevara. The report details that Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.  In 1989, Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d.  In 1989, Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted. Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

e.  In 1988, Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence. Also during the Felix Valentin shooting investigation, Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Guevara attributed to him. After Jacques Rivera's exoneration, he brought suit against Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey.

- 24 -

f.  In 1989, Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

g.  In 1989, Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

h.  In 1991, Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

i.  In 1991, Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, but later came forward to recant and shed light on Guevara's misconduct.

j.  In 1993, Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

k.  In 1995, Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses previously told the police that they had not been able to see the shooter.

l.  In 1995, Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

- 25 -

m. In 1995, Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight-hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

n. In 1995, Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

o. In 1995, Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Guevara as much. In addition, Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Guevara that the car in question was not the one used in the shooting.

p. In 1996, Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

q. In 1997, Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

r. In November 2001, Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had

ordered for all witnesses to be excluded from the courtroom to prevent witness collusion.

s.  In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Guevara conducted an unduly suggestive lineup. In this instance, Guevara had concocted a photo array in which Gonzalez's photo was the only one that stood out from the rest.

t.  In 1982, Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the CPD's Office of Professional Standards (OPS).

u.  In 1982, Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

v.  In 1983, Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately twenty-three (23) hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claims that the Area Five police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

w.  In 1984, Guevara and other officers physically assaulted Graciela Flores and her 13-year-old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

x.  In 1985, Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad

car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

y.  In 1986, Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

z.  In 1986, Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

aa. In 1986, Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

bb. In 1989, Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

cc. In 1991, Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for fifty (50) years. Guevara then promised Rivera that if he signed a statement, he could go home.

dd. In 1992, Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and

remanded Ms. Montanez's conviction for murder, noting that "not only was the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

ee. In 1993, Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

ff. In 1993, Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

gg. In 1993, Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder. Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of the crime for which Guevara had arrested him. Vicente has since testified that his statements were false and that Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

hh. In 1994, Guevara, after fourteen (14) hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

ii. In 1995, Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room

and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

jj. In 1997, Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

kk. In 1997, Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

ll. In 1998, Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

mm.   In 1998, Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After forty (40) hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

nn. In 1999, Guevara and his colleagues repeatedly punched David Gecht in the stomach and back and struck him during an interrogation. After this prolonged abuse, Gecht told Guevara and the other officers he would do "whatever they wanted," and adopted a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge. In addition, Guevara threatened Gecht's girlfriend, Colleen Miller, telling her that she would be arrested and that the child she was expecting would be born in prison and then taken from her if she did not cooperate with them. Guevara used Miller's fear for herself and her unborn child to extract a fabricated statement from her implicating Gecht in the shooting.

- 30 -

oo. In 1991, Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

104.     Neither Guevara nor Halvorsen ever received discipline from The City or the CPD for any of the conduct set out above.

105.     In fact, The City and CPD failed to supervise or discipline its police officers, including Guevara, Halvorsen, and other presently unknown Defendants. Police Officer Defendants engaged in the misconduct set forth in this Complaint because they knew that The City and CPD tolerated and condoned such conduct.

**I.   *Plaintiff's wrongful incarceration and post-trial affidavits of Figueroa***

106.     Plaintiff was just 21-years-old at the time of his arrest. The following fifteen (15) years of his life were consumed by the horror of wrongful imprisonment.

107.     Because of the Defendants' misconduct, Plaintiff's opportunity to grow older with his family and make a life with them was taken away. Plaintiff's relationships with his family and friends were severely harmed.

108.     Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions.

109.    Plaintiff has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

110.    Plaintiff never knew whether the truth would come out or whether he would ever be exonerated for a crime he had not committed.

111.    In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, rage, and other physical and psychological effects.

112.    Plaintiff was branded a murderer. He has suffered profound reputational harm as a result.

113.    Throughout his incarceration, Plaintiff maintained his absolute innocence and filed multiple appeals and petitions for post-conviction relief to challenge his convictions, to no avail.

114.    In 1999 and during his incarceration, Plaintiff obtained three affidavits from Figueroa, one handwritten and two typed. In sum, the affidavits established that Guevara told Figueroa that he "wanted to get [Angel]", that Guevara forced Figueroa to identify Plaintiff as Yolanda's shooter and that Guevara coerced and coached Figueroa to falsely implicate Plaintiff during his grand jury testimony. Despite obtaining these affidavits, Plaintiff was denied post-conviction relief.

115.    Plaintiff was ultimately released on parole on January 10, 2010, after serving fifteen (15) years of hard, undeserved time in maximum security prisons.

### J. *Plaintiff's Exoneration*

116.    On November 10, 2022, Plaintiff filed his Petition for Relief from Judgement based on new evidence regarding Guevara's extensive practice of fabricating evidence and framing innocent individuals for homicides that they unequivocally did not commit.

117.    On April 25, 2023, and without any objection from the State, Judge Diana Kenworthy granted Plaintiff's petition and vacated his convictions on all grounds.

118.    The State immediately dismissed the charges against Plaintiff with prejudice and Plaintiff immediately filed his Petition for a Certificate of Innocence pursuant to 735 ILCS 5/2-702.

119.    At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half of his life.

## V.    CAUSES OF ACTION

### COUNT I—42 U.S.C. § 1983
### Due Process
### (Fourteenth Amendment)

120.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

121.    As described in detail above, the Police Officer Defendants, while acting individually, jointly, and in conspiracy with one another, and others, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

122.    In the manner described more fully above, the Police Officer Defendants deliberately withheld exculpatory evidence, including but not limited to the fact that

- 33 -

Figueroa could not identify Plaintiff as the shooter at any point of their investigation; that Police Officer Defendants manipulated photo arrays and lineups and lied about the results of same; that Figueroa's written statement and grand jury testimony were completely fabricated; and that Police Officer Defendants used unconstitutionally coercive and manipulative techniques in an effort to intentionally frame Plaintiff for Yolanda's murder.

123. Police Officer Defendants also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in Yolanda's murder, obtained Plaintiff's conviction using that false evidence as well as fabricated witness statements and testimony, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

124. In addition, Police Officer Defendants produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Plaintiff's purported connection to Yolanda's murder, contained statements and described events that were wholly fabricated, and that Police Officer Defendants knew to be patently false. Police Officer Defendants signed those reports, as investigators and/or supervisors, despite their knowledge that the information contained in them was false.

125. In addition, based upon information and belief, Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

126.     The misconduct of Police Officer Defendants directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of his liberty, thereby denying his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and there is a reasonable probability that he would not have been convicted.

127.     The misconduct described in this Count was objectively unreasonable, undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

128.     As a result of the misconduct of the Police Officer Defendants described in this Count, Plaintiff suffered loss of liberty, loss of earning capacity, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

129.     The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

### COUNT II—42 U.S.C. § 1983
### Unlawful Detention
### (Fourth and Fourteenth Amendments)

130.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

131.     In the manner described more fully above, Police Officer Defendants, individually, jointly, and in conspiracy with one another, and others, as well as under

- 35 -

color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

132. In so doing, Police Officer Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

133. Police Officer Defendants maliciously initiated and continued judicial proceedings against Plaintiff, resulting in injury.

134. Police Officer Defendants chose Plaintiff, in part, as a result of his Latino race and alleged gang affiliation.

135. The judicial proceedings against Plaintiff were terminated in his favor when the Circuit Court of Cook County-Criminal Division granted the request of the Cook County State's Attorney's Office to dismiss all charges against him arising out of the murder of Yolanda.

136. The misconduct described in this Count was objectively unreasonable, undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

137. As a result of the misconduct of the Police Officer Defendants described in this Count, Plaintiff suffered loss of liberty, loss of earning capacity, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

138. The misconduct described in this Count by Police Officer Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

## COUNT III—42 U.S.C. § 1983
### Failure to Intervene

139. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

140. In the manner described above and during the constitutional violations described herein, one or more of the Police Officer Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

141. As a result of the Police Officer Defendants' failure to intervene to prevent violations of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Police Officer Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

142. The misconduct described in this Count was objectively unreasonable, undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

143. As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, loss of earning capacity, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

144. The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

## COUNT IV—42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

145. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

146. The Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby deprived him of his constitutional rights, all as described in the various paragraphs of this Complaint.

147. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

148. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

149. The misconduct described in this Count was objectively unreasonable, undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

150. As a result of the misconduct of the Police Officer Defendants described in this Count, Plaintiff suffered loss of liberty, loss of earning capacity, great mental anguish,

humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

151. The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

## COUNT V- 42 U.S.C. § 1983
### Concealment of Exculpatory Evidence in Violation of *Brady v. Maryland* *(Fourteenth Amendment)*

152. Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

153. Police Officers Defendants knowingly concealed from the Defendant and/or the prosecutor exculpatory and/or impeachment evidence, and the evidence was not otherwise available to Plaintiff, through the exercise of reasonable diligence, to make use of at his murder trial.

154. The evidence that the Police Officer Defendants concealed was material to Plaintiff's defense and would have likely altered the result of his trial.

155. As a result of the misconduct of the Police Officer Defendants described in this Count, Plaintiff suffered loss of liberty, loss of earning capacity, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

156. The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

## COUNT VI—42 U.S.C. § 1983
### *Monell* Policy and Practice Claim against the Defendant, City of Chicago

157. Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

158. As described more fully herein, the Defendant City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

159. Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City, as well as by the actions of policymaking officials for the City.

160. At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City failed to promulgate proper or adequate rules, regulations, policies, or procedures on: the conduct of photo arrays and lineups; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; the obtaining of statements and testimony from witnesses; the maintenance of investigative files and disclosure of those files in criminal proceedings; and meaningfully disciplining officers accused of such unlawful conduct. In addition, or in the alternative, the City failed to train or supervise officers and agents of the CPD and the City on the above topics, as well as the conduct of interrogations and the techniques to be used when questioning criminal suspects and witnesses. The City declined to implement adequate policies or training in these areas even though the need for such policies and training was obvious, and the failure to do so would lead to violations of constitutional rights. The decision to not

implement adequate policies or training in these areas also contributed to the widespread practices described in this Complaint.

161. The failure to promulgate proper or adequate rules, regulations, policies, procedures and training was committed by officers and agents of the CPD and the City, including the Police Officer Defendants.

162. At all times relevant herein, final policymakers for the City and the CPD knew of these problems, allowed them to continue and made decisions not to implement adequate policies, training, supervision or discipline.

163. The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip CPD officers with the specific tools—including policies, training, and supervision—to handle the recurring situations of how to address, preserve, and disclose exculpatory evidence; how to conduct photo arrays and line-ups; how to prepare witnesses for grand jury testimony; and how to generate investigative reports properly and truthfully.

164. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had notice of a widespread practice and custom by officers and agents of the CPD and the City under which witnesses were compelled against their will to implicate innocent individuals in crimes and to parrot the false narratives manufactured by CPD officers.

165. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the CPD and The City under which

individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

166. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

167. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of The City directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

168.    The above widespread practices and customs, so well settled as to constitute *de facto* policies of The City, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

169.    As a result of the policies and practices of The City, numerous individuals have been wrongly convicted of crimes that they did not commit.

170.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

171.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of The City, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### COUNT VII—State Law Claim
### Intentional Infliction of Emotional Distress

172.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

173.    The actions, omissions, and conduct of the Police Officer Defendants, acting as investigators and as set forth above, were extreme and outrageous.

174.    These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause or in reckless disregard of, the probability that their conduct would cause severe emotional distress to Plaintiff, as is more fully alleged above.

175.    As a result of these Defendants' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII—State Law Claim
## Malicious Prosecution

176.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

177.    In the manner described above, the Police Officer Defendants, individually, jointly, or in conspiracy with each other, and others, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, despite the fact that they knew Plaintiff was innocent.

178.    In so doing, these Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.

179.    These judicial proceedings were instituted and continued maliciously, and were rooted in the Police Officer Defendants' prejudice against Plaintiff, resulting in injury.

180.    The judicial proceedings against Plaintiff were terminated in his favor when the charges against him were dismissed.

- 44 -

181.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

182.   As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, loss of earning capacity, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX—State Law Claim
## Civil Conspiracy

183.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

184.   As described more fully in the preceding paragraphs, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

185.   The violations of Illinois law described in this Complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

186. The misconduct described in this Count was objectively unreasonable, undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

187. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X—State Law Claim
## Indemnification

188. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

189. Illinois Code 65 ILCS 5/1-4-5 provides those public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

190. The Police Officer Defendants were employees of the CPD, an agency of The City, who acted within the scope of their employment while committing the misconduct described above.

191. The City is liable to indemnify any compensatory judgment awarded against the Police Officer Defendants.

## COUNT XI—State Law Claim
## Vicarious Liability

192. Plaintiff incorporates each paragraph of this Complaint as if fully restate here.

193.     In committing the acts alleged in the preceding paragraphs, the Police Officer Defendants were employees of The City, acting at all relevant times within the scope of their employment and under color of law.

194.     The City is liable as a principal for all state law torts, as identified in Counts VII, VIII, and IX of this Complaint, committed by its agents.

WHEREFORE, Plaintiff, ANGEL DIAZ, respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF CHICAGO, DET. REYNALDO GUEVARA, former Chicago Police Department Detective,  GERI YANOW, as Special Representative of the Estate of DET. ERNEST HALVORSEN, deceased former Chicago Police Department Detective, and other presently unknown officers and/or agents of the CHICAGO POLICE DEPARTMENT, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants for constitutional violations, and any other relief this Court deems just and appropriate.

## VI.    JURY DEMAND

Plaintiff demands trial by jury on all counts of his Complaint pursuant to Federal Rule of Civil Procedure 38(B).

Respectfully submitted,


/s/Chester L. Cameron, Jr.                    /s/Jon F. Erickson
An attorney for Plaintiff                     An Attorney for Plaintiff

Chester L. Cameron, Jr. (Trial Bar)               Samuel E. Adam, Jr.
Samuel R. Carl                                **SAM ADAM, JR. LAW GROUP, LLC**
Brennan B. Hutson                             7512 Dr. Phillips Dr., Ste. 50-934
**MIDWEST INJURY LAWYERS, LLC**               Orlando, FL 32819
155 N. Wacker Drive, Ste. 4250                (312) 726-2326 (telephone)
Chicago, IL 60606                             attysamadamjr@yahoo.com
(312) 786-5881 (telephone)
(773) 595-4716 (facsimile)
ccameron@midwestinjurylawyers.com
scarl@midwestinjurylawyers.com
bhutson@midwestinjurylawyers.com

Jon F. Erickson (Trial Bar)
**ERICKSON LAW, LLC**
155 N. Wacker Drive, Ste. 4250
Chicago, IL 60606
(773) 875-4646 (telephone)
(773) 409-5827 (facsimile)
jonericksonlaw@gmail.com